# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04 C 7204 |
| | ) | |
| v. | ) | Judge Joan B. Gottschall |
| | ) | |
| 120194 CANADA, LTD., et al., | ) | Magistrate Judge Michael T. Mason |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The Federal Trade Commission ("the FTC" or "the Commission") has sued Paul Price and Elissa Price (together, "the Prices") and several corporations ("the corporate defendants")[1] for violations of the Federal Trade Commission Act, 15 U.S.C. § 45(a) ("FTC Act" or "the Act"), and the Telemarketing Sales Rule, 16 C.F.R. § 310 *et seq*. ("TSR"). The FTC has moved for summary judgment as to the Prices and for entry of a default judgment as to the corporate defendants. For the reasons set forth below, the motion is granted.

---

[1] The corporate defendants are: (1) 120194 Canada, Ltd., d/b/a Veritech Communications, Veritech Communication Services, Veritech, Prime One Benefits, Prime One Financial, Prime One, First National Credit Service, and U.S. National Credit ("Veritech"); (2) Prime One Financial Group, Inc., d/b/a Prime One Benefits, Prime One Financial, Prime One, First National Credit Service, and U.S. National Credit ("Prime One"); (3) Marketing Directives, Inc., d/b/a Ameriline and Ameriline Corp. ("Marketing Directives"); (4) 1284383 Ontario Inc., d/b/a First National Credit Service and Direct Service Management ("First National Credit"); and (5) 1309529 Ontario Inc., d/b/a U.S. National Credit ("U.S. National Credit").

The FTC's amended complaint initially named two other defendants: Mishele Wells ("Wells") and Simax Corp., d/b/a America's Gift House, Gold Universal, Ameriline, and Ameriline Corp. ("Simax"). The FTC has since reached what it describes as a "tentative settlement" with Wells and Simax. *See* Minute Order, Aug. 1, 2006. As a result, the claims against the latter defendants are not discussed in this order.

## BACKGROUND

According to the FTC's complaint, the Prices were the owners and/or principals[2] of five Canadian corporations[3] that were engaged in a fraudulent telemarketing scheme that promised to provide low-interest major credit cards to U.S. consumers with poor credit histories. As part of the scheme, the telemarketers contacted consumers and told them that they could obtain unsecured credit cards such as Visa or MasterCard for a one-time "processing fee" ranging from $159.00 to $236.00. Pl.'s 56.1 Stmt. ¶¶ 19, 22, 23. Once the consumer agreed to the offer, he or she was contacted by a "verifier," who took the consumer's bank account information. *Id.* ¶ 29. Consumers' bank accounts were subsequently debited for the relevant amount, but the consumers never received the credit cards. Instead, they were sent "benefits packages" containing coupons for discounts on travel, recreation, roadside assistance, medical plans, satellite service, and cellular telephones, along with a pamphlet providing information about credit repair. *Id.* ¶¶ 33-34. In some cases, the benefits packages contained additional forms that consumers could fill out to apply for credit cards on their own. *Id.* ¶ 35. Some consumers also received a credit application form authorizing the defendants to apply for credit on the consumers' behalf. *Id.* ¶ 36. Those who completed the latter forms still never received a credit card; rather, any credit card applications the defendants received were simply filed away in their cabinets. *Id.* ¶¶ 38-39.

---

[2] Paul Price is the owner and principal of all of the corporate defendants. Pl.'s 56.1 Stmt. ¶ 11. Elissa Price is the principal of all of the corporate defendants. *Id.* ¶ 13. She was also an owner of Simax. *Id.*

[3] Marketing Directives is a Delaware corporation with its principal place of business in Ontario. *Id.* ¶ 6.

When consumers contacted the defendants to check on the status of their applications, the defendants would occasionally complete credit card applications for consumers on the Internet website of Orchard Bank. *Id.* ¶ 40. The defendants then printed out the applications and sent them back to consumers so that the consumers could apply to Orchard Bank for the card themselves. *Id.* The Orchard Bank card was different from the cards described in the telemarketers' sales pitches. For example, in order to receive the card, consumers were required to open a savings account, maintain a minimum balance of $200, and to secure their line of credit. *Id.* ¶ 41. The defendants were not authorized to use Orchard Bank's applications in their promotions. *Id.* ¶ 42. Nor were they authorized by Visa or MasterCard to issue credit cards, or affiliated with any other financial institution that provides credit cards. *Id.* ¶¶ 45-46.

Many consumers contacted the defendants to complain that they had not received their cards and to demand refunds. Only a small portion of these—those who contacted the Better Business Bureau ("BBB")—received a refund, and even in these cases the refund was only partial. *Id.* ¶ 49, 51. In all, according to the FTC, the defendants defrauded over 40,000 U.S. consumers out of at least $8,104,773.94. *Id.* ¶ 55.

## DISCUSSION

### A. Legal Standard

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court must view the record and any inferences to be drawn from

it in the light most favorable to the party opposing summary judgment. *See Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir. 1991). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court will "not weigh the evidence, but '[i]f the evidence is merely colorable, or is not significantly probative' summary judgment is appropriately granted." *Flip Side Prods., Inc. v. Jam Prods., Ltd.*, 843 F.2d 1024, 1032 (7th Cir. 1988) (quoting *Liberty Lobby*, 477 U.S. at 249-50)).

Here, none of the defendants has responded to the FTC's motion. Although the defendants asserted the Fifth Amendment privilege against self-incrimination in earlier responsive pleadings, they have offered no explanation whatsoever for their failure to respond to the instant motion. As a result, the statements in the FTC's Rule 56.1 Statement of Material Facts are deemed admitted. *See* N.D. Ill. Local R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("Local Rule 56.1's enforcement provision provides that when a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion. We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). While the admission of the moving party's statement of material facts generally results in summary judgment for the moving party, *see Dixon v. Ill. State Bd. of Educ.*, No. 04 C 1630, 2005 WL 2387686, at *1 (N.D. Ill. Sept. 23, 2005), summary judgment is not

4

automatic. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (citing *Reales v. Consol. Rail Corp.*, 84 F.3d 993, 997 (7th Cir. 1996)). Rather, the ultimate burden of persuasion remains with the moving party to show that it is entitled to judgment as a matter of law. *Id.* (citing *Wienco, Inc. v. Katahn Assocs., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992)).[4]

## B. Section 5(a) of the Federal Trade Commission Act

Section 5 of the FTC Act makes unlawful "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1); *see also F.T.C. v. World Media Brokers Inc.*, No. 02 C 6985, 2004 WL 432475, at *6 (N.D. Ill. Mar. 2, 2004). The FTC is empowered to bring actions in federal court to enforce violations of section 5 and to seek appropriate equitable relief.

---

[4] In support of many of the statements making up its Rule 56.1 Statement of Material Facts, the FTC has cited the defendants' assertion of the Fifth Amendment privilege against self-incrimination in refusing to answer allegations in the complaint or questions propounded in interrogatories and requests for admission. This is appropriate, the FTC argues, because it is permissible for the court to draw adverse inferences from a party's refusal to testify in civil cases. While the latter principle is correct, however, it is subject to important qualifications. As the Seventh Circuit has stated:
> [A]lthough inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and without regard to the other evidence exceeds constitutional bounds. Our holding . . . then, is conditioned on the fact that the admission it effects does not lead directly and without more to the entry of summary judgment, but merely establishes the factual basis from which the Rule 56 analysis will proceed.

*LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391-92 (7th Cir. 1995) (citations and internal quotation marks omitted); *see also F.T.C. v. Consumer Alliance, Inc.*, No. 02 C 2429, 2003 WL 22287364, at *4 (N.D. Ill. Sept. 30, 2003) (applying *LaSalle*'s holding to requests for admission in addition to allegations in a complaint). Fortunately, the FTC has cited evidence beyond the defendants' invocation of the Fifth Amendment privilege in support of each of its statements of material fact. Hence, the court has not deemed any of the FTC's statements admitted based solely on adverse inferences resulting from the defendants' invocation of the Fifth Amendment, and entry of summary judgment in favor of the FTC presents no constitutional problem.

*F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 634-35 (7th Cir. 2005). To establish that the defendants violated section 5, the FTC must show that the defendants made material misrepresentations or omissions, or engaged in practices, that "likely would mislead consumers, acting reasonably, to their detriment." *F.T.C. v. Pac. First Benefit, LLC*, No. 02 C 8678, 2007 WL 162168, at *4 (N.D. Ill. Jan. 11, 2007) (quoting *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988)). A statement or practice qualifies as "material" if it is likely to affect the consumer's decision to buy the product or service. *Id.* (citing *Bay Area Bus. Council*, 423 F.3d at 635); *FTC v. Datacom Mktg., Inc.*, No. 06 C 2574, 2006 WL 1472644, at *4 (N.D. Ill. May 24, 2006). To be actionable under section 5, misrepresentations or practices need not be made with an intent to deceive. *World Travel Vacation Brokers*, 861 F.2d at 1029 (citing *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)). Moreover, the omission of material information without an affirmative misrepresentation may give rise to an FTC Act violation. *Bay Area Bus. Council*, 423 F.3d at 635 (citing *F.T.C. v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)).

Here, the undisputed facts show that the defendants violated section 5 of the FTC Act. First, the defendants unquestionably made misrepresentations: specifically, the defendants falsely told consumers that they would receive an unsecured major credit card after paying a processing fee. Second, the uncontroverted evidence shows that the misrepresentations were material. For example, the FTC has amassed declarations by numerous consumers who have specifically stated that the defendants' misrepresentations affected their decisions to pay the processing fee for the cards. *See* Pl.'s Exs. 1-18. The materiality of the misrepresentations is also evidenced by the large number of complaints

that the defendants received from disgruntled consumers who never received the promised card. *See* Pl.'s Ex. 48, Nicola Robinson Dep. 210:6-12 (stating that 6,700 customers had applied for refunds). Finally, the misrepresentations were detrimental to the consumers, all of whom paid between $159.00 to $236.00 but received only the valueless and inaptly named "benefits package" in return.

In every relevant respect, the instant case is indistinguishable from *FTC v. Pacific First Benefit, LLC*, No. 02 C 8678, 2007 WL 162168 (N.D. Ill. Jan. 11, 2007). There, as here, the FTC brought suit against Canadian-based corporations that falsely promised to provide unsecured credit cards to consumers who paid the defendants a fee. *Id.* at *5. The court further described the scheme as follows:

> Defendants' representatives provided specific details about the credit card offer, such as purported low interest rates, lack of annual fees, and credit limits of up to $5,000. After paying the requested fees, consumers did not receive credit cards. Instead, they received essentially worthless "benefit packages" containing easily available information about how to repair bad credit, and offers for discounted vacations and shopping.

*Id.* The FTC's account of the facts was deemed admitted because, like the defendants here, the defendants in *Pacific First Benefit* mounted virtually no response to the FTC's motion for summary judgment. The *Pacific First Benefit* Court easily concluded that summary judgment was appropriate on the Commission's FTC Act claim. The court here similarly concludes that the FTC is entitled to summary judgment with respect to its FTC Act claim.

### C. The Telemarketing Sales Rule

The FTC also alleges that the defendants have violated the Telemarketing Sales Rule. The TSR is the Trade Regulation promulgated by the FTC to implement the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108.

7

*See Bay Area Bus. Council*, 423 F.3d at 635. The FTC claims that the defendants violated 16 C.F.R. § 310.3(a)(2)(iii), which makes it unlawful for telemarketers to misrepresent, "directly or by implication, in the sale of goods or services . . . [a]ny material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer." *See also Pac. First Benefit*, 2007 WL 162168, at *5. The Commission also alleges that the defendants violated section 310.4(a)(4), under which it is an "abusive tactic" and a violation of the TSR for a telemarketer to request or receive "payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person." 16 C.F.R. § 310.3(a)(4); *Pac. First Benefit*, 2007 WL 162168, at *5. Under section 3(c) of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102(c), and section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the TSR constitute unfair or deceptive acts or practices in violation of section 5(a) of the FTC Act. *Pac. First Benefit*, 2007 WL 162168, at *5.

The undisputed facts here show that the defendants violated both section 310.3(a)(2)(iii) and 310.4(a)(4). With respect to section 310.3(a)(2)(iii), it is clear that the defendants misrepresented a material aspect of the goods subject to a sales offer. The defendants were selling a service (viz., that of procuring credit cards) and the defendants misrepresented numerous material aspects of that service (e.g., the fact that consumers would receive a benefits package instead of a credit card). Nor can there be any doubt that the defendants violated section 310.4(a)(4): the evidence clearly shows that the defendants requested and accepted a fee in advance after representing that consumers

were guaranteed or highly likely to receive an unsecured major credit card. Summary judgment is therefore appropriate as to the FTC's TSR claim. *See, e.g.*, *Pac. First Benefit*, 2007 WL 162168, at *5 (granting summary judgment on TSR claim involving credit card scheme similar to the one at issue here); *Bay Area Bus. Council*, 423 F.3d at 635.

### D. Liability of the Various Parties

The FTC argues that the corporate defendants are jointly and severally liable for the above-described violations of the FTC Act and the TSR. Corporate defendants may be held jointly and severally liable for injuries caused by violations of the FTC Act where, though separate entities, the corporations operate as a "common enterprise." *Bay Area Bus. Council*, 423 F.3d at 635; *F.T.C. v. Seismic Entm't Prods., Inc.*, 441 F. Supp. 2d 349, 354 (D.N.H. 2006) (citing *FTC v. World Media Brokers*, 415 F.3d 758, 765-66 (7th Cir. 2005)) ("Individual and corporate defendants may be held jointly and severally liable for violations of the FTC Act."); *F.T.C. v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1202 (C.D. Cal. 2000) ("Defendants found to be a common enterprise are held jointly and severally liable for the injury caused by their violations of the FTC Act.") (internal quotation marks omitted); *F.T.C. v. Think Achievement Corp.*, 144 F. Supp. 2d 993, 1011 (N.D. Ind. 2000).

Factors to be considered in determining whether corporate defendants are engaged in a common enterprise include: (1) common control; (2) sharing office space and offices; (3) whether business is transacted through a maze of interrelated companies; and (4) commingling of funds. *Id*; *see also F.T.C. v. Wolf*, No. 94-8119-CIV-FERGUSON, 1996 WL 812940, *7-8 (S.D. Fla. Jan. 1, 1996).

The FTC's evidence establishes that all of the corporate defendants were controlled by Paul Price (and to a lesser extent by Elissa Price). Pl.'s Ex. 44, Lennox Decl. ¶¶ 7, 9, 12. The record also shows that the corporate defendants shared office space and employees. Indeed, the corporations often appear to have used their various names interchangeably, and employees often seem to have been unclear about the entity for which they were working. *See, e.g.*, Pl.'s Ex. 46, Pam Scamurra Dep. 27:4-28:8; Pl.'s Ex. 47, Jennifer Perrier Dep. 17:14-18:13. Similarly, there is ample evidence that the corporations constituted a "maze of interrelated companies" through which business was conducted. It appears, for example, that "Prime One," "First National Credit," and "U.S. National Credit" were the business names used by telemarketers, and that "Veritech" was the name used by the verifiers. *See, e.g.*, Pl.'s Ex. 49, Lulie Guintoli Dep. 17:2-18:13; Pl.'s Ex. 44, Lennox Decl. ¶ 7. Veritech's corporate name appeared on employees' paychecks even when they were employed by Prime One. Pl.'s Ex. 45, Liam Walshe Decl. ¶ 4. Evidence with respect to the commingling of funds is more difficult to glean from the record; but such evidence is only one factor in the overall calculus and thus is not essential to the FTC's case. Considering all of the factors, and taking into account the record as a whole, the FTC has made a sufficient showing that the corporate defendants were engaged in a common enterprise. Accordingly, the court concludes that the corporate defendants are jointly and severally liable for violating the FTC Act and the TSR. *See. e.g.*, *J.K. Publ'ns*, 99 F. Supp. 2d at 1202 (finding corporate defendants jointly and severally liable under the FTC Act where all were under the common control of a single individual, shared office space, employees, and officers, and conducted their businesses through the same web sites).

The FTC also argues that the Prices are individually liable for the corporate defendants' deceptive acts and practices. Once corporate liability has been established, individuals may be held liable under the FTC Act if the FTC can show that: (1) the individual defendants participated directly in the corporations' deceptive practices or acts or had authority to control them; and (2) the individual had some knowledge of the practices. *See F.T.C. v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *see also Bay Area Bus. Council*, 423 F.3d at 636.

The FTC has met both of these requirements. First, both of the Prices participated in, and had control over, the fraudulent telemarketing practices here at issue. The uncontested evidence shows that both were intimately involved in the corporate defendants' daily operations. Among other things, both interviewed, hired, trained, and supervised employees. Pl.'s 56.1 Stmt. ¶ 58, 71. Both handled customer complaints and the granting of refunds. *Id.* ¶ 57. Both also created, edited, reviewed, and approved the scripts used by the telemarketers and verifiers. *Id.* ¶¶ 59, 72. Similarly, both of the Prices were aware of the corporate defendants' deceptive practices. Many former employees have testified specifically to the fact that the Prices were aware of the telemarketers' representations to consumers. *Id.* ¶¶ 66 77; Pam Scamurra Dep. 19:24-20:20; Nicola Robinson 250:22-254:5. Indeed, both of the Prices monitored phone calls between telemarketers and consumers. *Id.* ¶¶ 60, 65-67, 74. The court therefore concludes that the Prices are individually liable for the acts of the corporate defendants.

### C. The FTC's Requested Relief

The FTC seeks three forms of relief. First, the Commission seeks a permanent injunction forbidding the defendants from engaging in the deceptive acts and practices

discussed above and barring them from selling any other credit-related products or services to U.S. consumers; second, the FTC seeks a monetary judgment of $8,104,773.94; and third, the Commission asks the court to enter a default judgment against the corporate defendants. The court considers each form of relief in turn.

   1.   **Permanent Injunctive Relief**

The FTC first asks the court to enter a permanent injunction forbidding the defendants from engaging in the practices that have been found violative of section 5 of the FTC Act and the TSR, and barring them from telemarketing or selling credit-related products or services to U.S. consumers. Section 13(b) of the FTC Act provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b); *see also F.T.C. v. Consumer Alliance, Inc.*, No. 02 C 2429, 2003 WL 22287364, at *7 (N.D. Ill. Sept. 30, 2003). The Seventh Circuit has made clear that "cases involving a 'straightforward violation of section 5' are 'proper cases' for the issuance of a permanent injunction."). *F.T.C. v. U.S. Sales Corp.*, 785 F. Supp. 737, 752 (N.D. Ill. 1992) (quoting *F.T.C. v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1988)).

Having shown that the defendants violated section 5, the FTC is entitled to the permanent injunction it has requested.[5] Indeed, courts have routinely granted permanent

---

[5] The fact that the FTC has carried its burden of showing that the defendants violated section 5 is enough to warrant entry of a permanent injunction here. However, the FTC has adduced a number of further considerations that make the need for such relief even more apparent. In particular, the FTC points out that the scheme at issue in this case developed out of the fraudulent activities of another corporation, Consumer Credit Services ("CCS"), which was partially owned and operated by Elissa Price's father, David Wells. Pl.'s 56.1 Stmt. ¶ 53. In 1999, the FTC sued CCS in the Southern District of New York. The court ultimately found the defendants jointly and severally liable for a monetary judgment of $10,000,000 and issued a permanent injunction forbidding the

injunctions in similar cases. *See, e.g.*, *Bay Area Bus. Council*, 2004 WL 769388, at *13 (granting the FTC a permanent injunction where a preliminary injunction had already been entered against the defendants barring them from continuing deceptive sales practices and where defendants failed to present any facts or reasons why their deceptive business practices should not be permanently enjoined); *Consumer Alliance*, 2003 WL 22287364, at *7 ("Due to the egregious and fraudulent conduct of the defendants in this case, the Court holds that a permanent injunction as to each defendant is appropriate to prevent further fraud and to effectuate the purpose of the FTC Act. There is no evidence in the record that defendants ever provided anything of value to a large class of persons upon which they preyed, and yet, defendants billed charges to these persons without their authorization. If there ever were a case that warranted the range of permanent injunctive relief proposed by the FTC, this is it."); *Think Achievement*, 144 F. Supp. at 1018 (permanent injunction was appropriate given defendants' prolonged engagement in deceptive trade practices, the failure of prior enforcement efforts in requiring lawful activity and stopping unlawful activity, and the likelihood of future violation).[6] The court grants the FTC's request for permanent injunctive relief.

### 2. Monetary Relief

In addition to seeking a permanent injunction, the FTC also requests that a monetary judgment be entered against the defendants in the amount of $8,104,773.94,

---

defendants from engaging in various business practices. *F.T.C. v. 1263523 Ontario, Inc.*, 205 F. Supp. 2d 205, 211 (S.D.N.Y. 2002). The Prices assumed control of the business and renamed it, and developed the scheme at issue in this litigation. Pl.'s 56.1 Stmt. ¶ 53.
[6] The court also notes that it has already issued injunctive relief in this case. In November 2004, the court granted the FTC's ex parte motion for a temporary restraining order ("TRO"); the TRO was later extended, *see* Minute Order, Nov. 17, 2004, and in December 2004, the parties agreed to the entry of a preliminary injunction with an asset freeze. *See* Minute Order, Dec. 10, 2004.

which represents the defendants' total net sales. The Seventh Circuit has held that the "district court's authority to grant a permanent injunction also includes the power to grant other ancillary relief sought by the Commission." *F.T.C. v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997) (citing *World Travel Vacation Brokers*, 861 F.2d at 1026). The power to grant such ancillary relief includes the authority to order repayment of money for consumer redress as restitution or rescission. *Id.*

In calculating the appropriate amount of monetary relief, a district court must engage in a two-step, burden-shifting analysis. *FTC v. QT Inc.,* 448 F. Supp. 2d 908, 974 (N.D. Ill. 2006). First, the FTC must show that its calculations reasonably approximated the amount of customers' net losses. *Febre*, 128 F.3d at 535 (citing *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996)). The burden then shifts to the defendants to show that the FTC's figures are inaccurate. *Id.*

The FTC has met its burden of showing that its calculations reasonably approximated the amount of consumers' losses. In particular, the Commission has submitted declarations and records showing the number of transactions processed on behalf of the various defendant corporations, the total dollar amount of those transactions, and amounts subtracted due to refunds paid. Pl.'s 56.1 Stmt. ¶¶ 79-80; Pl.'s Ex. 50, Jerry Federico Decl. ¶ 4; Pl.'s Ex. 51, Steven Davis Decl. ¶ 7; Pl.'s Ex. 52, Shawn Vink Decl. ¶ 6; Pl.'s Ex. 53, Laura Mikolaj Decl. ¶ 3; Pl.'s Ex. 54, Michael Liquornik Decl. ¶ 3. The defendants have not come forward with any indication that the FTC's calculations are

inaccurate. Hence, the court enters a judgment against the defendants in the amount of $8,104,773.94.[7]

### 3. The Corporate Defendants: Default Judgment

Finally, the FTC asks the court to enter a default judgment against the five corporate defendants in the case. The entry of default judgments is governed by Rule 55 of the Federal Rules of Civil Procedure. Rule 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed. R. Civ. P. 55(a); *Am. Nat. Bank & Trust Co. of Chicago v. Alps Elec. Co.*, No. 99 C 6990, 2002 WL 484845, at *1 (N.D. Ill Mar. 29, 2002). Once there has been an entry of default under Rule 55(a), a district court possesses the discretion under Rule 55(b)(2) to enter a default judgment. Fed. R. Civ. P. 55(b)(2); *see also Indiana State Council of Roofers Health & Welfare Fund v. Laughery Bros. Roofing & Siding Co.*, No. 3:06-CV-456 PS, 2007 WL 101826, at *1 (N.D. Ind. 2007) (citing *Hill v. Barbour*, 787 F. Supp. 146, 148 n.4 (N.D. Ill. 1992)). Specifically, Rule 55(b)(2) provides that if "the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice of the application for judgment at least

---

[7] As stated above, the FTC has reached a settlement with Simax Corp. and with its principal, Mishele Wells, which is currently pending final approval by the Commission. The FTC has requested that once the settlement is finalized, the liability of the remaining defendants be reduced by the amount paid by Wells and Simax. Accordingly, the court directs the Commission to inform the court once the settlement with the latter defendants has been approved, and to provide the court with a reasonably detailed account of any reductions that must be made to the current figure of $8,104,773.94.

3 days prior to the hearing on such application." Fed. R. Civ. P. 55(b)(2).[8] The court has broad discretion in deciding whether to enter a default judgment and may take a variety of considerations into account in making the determination. *See, e.g.*, *Am. Nat. Bank & Trust*, 2002 WL 484845, at *1 (citing *O'Brien v. R.J. O'Brien & Assocs.*, Inc., 998 F.2d 1394, 1398 (7th Cir. 1993)) ("The decision to enter a default judgment lies within the discretion of the district court."). As one treatise states:

---

[8] In contrast to Rule 55(b)(2), Rule 55(b)(1) provides that a judgment by default may be entered by the clerk instead of the court "[w]hen the plaintiff's claim against a defendant is for a sum certain or for a sum which can by computation be made certain." Fed. R. Civ. P. 55(b)(1). The FTC has not cited either provision of Rule 55(b)—indeed, the Commission has not cited Rule 55 at all or any authority in support of its request for a default judgment. Presumably, however, the FTC seeks entry of the judgment by the court instead of the clerk because the claim here is not for a "sum certain." Although the Commission seeks a definite monetary judgment, the precise figure is as yet undetermined pending finalization of the settlements with Mishele Wells and Simax. Moreover, in addition to seeking monetary restitution, the FTC seeks injunctive relief, and courts have frequently held that claims in such cases are not for sums certain. *See, e.g.*, *Commodity Futures Trading Comm'n v. Marquis Fin.l Mgmt. Sys., Inc.*, No. Civ.A. 03-74206, 2005 WL 3752233, at *1 (E.D. Mich. Jun. 8, 2005) ("Because the Complaint in this case seeks injunctive and other equitable relief, in addition to a sum certain, the Plaintiff seeks entry of judgment by the Court pursuant to FRCP 55(b)(2)."); *United States v. Fernandez*, No. CIV604CV1772ORL31JGG, 2005 WL 1332278, at *3 (M.D. Fla. May 4, 2005) ("As the United States has sought injunctive relief in this case, its claim is not for a sum certain or for a sum which can by computation be made certain. Accordingly, the Clerk may not enter judgment in this action under Federal Rule of Civil Procedure 55(b)(1). Any judgment must be entered by the Court under Federal Rule of Civil Procedure 55(b)(2)."); *S.E.C. v. Interlink Data Network of Los Angeles, Inc.*, Civ. A. No. 93-3073 R, 1993 WL 603274, at *6 (C.D. Cal. Nov. 15, 1993) ("[B]ecause the Commission seeks a default judgment barring Gartner from future violations of the federal securities laws and ordering him to disgorge the proceeds obtained in the securities offerings, the relief it seeks is not for a sum certain."); *F.T.C. v. Kitco of Nevada, Inc.*, 612 F. Supp. 1282, 1297 n.10 (D.C. Minn. 1985) ("Because plaintiff seeks a judgment that includes injunctive relief and restitution for injured consumers, plaintiff's claim against defendant . . . in the case at bar is not for a sum certain. Default must then be entered by the court."). Finally, to the extent that the FTC seeks to recover the costs of bringing the instant suit, *see* Compl. at 12, the amount of the judgment is subject to even further indeterminacy. *Cf.* 10A Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 2683 (3d ed. 1998) (noting decisions holding that the need to fix "reasonable" attorney's fees prevents the clerk from entering a judgment under Rule 55).

> In determining whether to enter a default judgment, the court is free to consider a number of factors that may appear from the record before it. Among these are the amount of money potentially involved; whether material issues of fact or issues of substantial public importance are at issue; whether the default is largely technical; whether plaintiff has been substantially prejudiced by the delay involved; and whether the grounds for default are clearly established or are in doubt. Furthermore, the court may consider how harsh an effect a default judgment might have; or whether the default was caused by a good-faith mistake or by excusable or inexcusable neglect on the part of the defendant. Plaintiff's actions also may be relevant; if plaintiff has engaged in a course of delay or has sought numerous continuances, the court may determine that a default judgment would not be appropriate. Finally, the court may consider whether it later would be obliged to set aside the default on defendant's motion, since it would be meaningless to enter the judgment as a matter of course if that decision meant that the court immediately would be required to take up the question of whether it should be set aside.

10A Charles Alan Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure § 2685 (3d ed. 1998).

The court concludes that entry of a default judgment against the corporate defendants is appropriate here. As an initial matter, the requirements of Rule 55(a) have been met, for default was entered against the corporate defendants in September and December 2005.[9] Second, the FTC has complied with Rule 55(b)(2)'s notice requirements. Since the corporate defendants have appeared in the action,[10] they were required to be served with written notice of the application for default judgment at least three days prior to the hearing on the FTC's application. The docket in this case shows that the FTC filed the present motion for summary judgment and default judgment on

---

[9] Default was entered against Veritech and Prime One on September 9, 2005. *See* Minute Order, Sept. 9, 2005. Default was entered against Marketing Directives, First National Credit, and U.S. National Credit on December 12, 2005. *See* Minute Order, Dec. 12, 2005.

[10] According to the docket, appearances were entered on behalf of Veritech, Prime One, and Marketing Directives, *see* docket entry 13, Nov. 11, 2004; docket entry 14, Dec. 12, 2004, but there is no record of an appearance ever being entered on behalf of First National Credit or U.S. National Credit.

July 21, 2006 and served the motion on the corporate defendants' representatives on the same day. *See* docket entries 82 & 85. A status hearing on the motion was held five days later, on July 26, 2006. *See* docket entry 89. Hence, the corporate defendants were given notice of the FTC's intention to seek default judgments against them.

Finally, many of the relevant factors singled out above counsel strongly in favor of entering a default judgment, and none of the factors counsels against it. To begin with, the default here is not merely technical, and the corporate defendants' failure to defend cannot be explained away as a mere oversight, a good faith mistake, or the result of excusable neglect. Rather, the corporations have had many opportunities to respond and have for their own reasons neglected to do so. Indeed, when none of the defendants responded to the FTC's motion, the court issued a minute order providing for a brief extension of the deadline. *See* Minute Order, Jan. 9, 2007. Defendants still failed to respond. By contrast, the FTC has not engaged in dilatory tactics of any sort. Finally, the grounds for default are clearly established and there is no reason to think that the court would later be obliged to set the default aside on the corporate defendants' motion. Given these considerations, the FTC's motion for a default judgment against the corporate defendants is granted.

## CONCLUSION

For the foregoing reasons, the FTC's motion for summary judgment against defendants Paul Price and Elissa Price and for entry of default judgment against the corporate defendants is granted. Before a final judgment in the case can be entered, the FTC must provide the court with: (1) a draft order which conforms to the terms of this memorandum opinion and order and which sets forth the specific terms of the permanent injunction to be entered; and (2) an update regarding the status of the Commission's settlement agreements with Mishele Wells and Simax Corp., with particular reference to any adjustments that must be made to the $8,104,773.94 awarded in monetary relief. Status is set for March 14, 2007.

ENTER:


_/s/_____
Joan B. Gottschall
United States District Judge

Dated: February 12, 2007